<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 09-4660**

───────────

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

ROBERT NICHOLAS ROSS,

        Defendant – Appellant.

───────────

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg.  John Preston Bailey, Chief District Judge.  (3:08-cr-00019-JPB-DJJ-1)

───────────

Argued:  September 24, 2010      Decided:  November 5, 2010

───────────

Before TRAXLER, Chief Judge, KING, Circuit Judge, and Jerome B. FRIEDMAN, United States District Judge for the Eastern District of Virginia, sitting by designation.

───────────

Affirmed by unpublished per curiam opinion.

───────────

**ARGUED**:  Barry Philip Beck, POWER, BECK & MATZUREFF, Martinsburg, West Virginia, for Appellant.  Erin K. Reisenweber, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee.  **ON BRIEF**:  Betsy C. Jividen, Acting United States Attorney, Wheeling, West Virginia, Paul T. Camilletti, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee.

───────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Defendant Robert Nicholas Ross appeals his conviction in the Northern District of West Virginia for being a felon in possession of multiple firearms, in contravention of 18 U.S.C. § 922(g)(1). On appeal, Ross maintains that the firearm evidence used against him should have been suppressed because the underlying search warrant affidavit knowingly, intentionally, and recklessly contained false statements that were necessary to establish probable cause. The district court, after an evidentiary hearing conducted pursuant to Franks v. Delaware, 438 U.S. 154 (1978), declined to suppress the firearms. Ross thereafter pleaded guilty to the indictment, reserving his right to appeal the suppression ruling. As explained below, we affirm.

I.

A.

On March 18, 2008, a grand jury in the Northern District of West Virginia returned an indictment against defendant Ross, alleging that he had three previous felony convictions for burglary under Maryland law. The indictment then alleged that Ross had "knowingly possessed in and affecting interstate commerce" three firearms, that is, a 12 gauge shotgun, a 30-06 rifle, and a .38 caliber revolver, in contravention of 18 U.S.C.

3

§ 922(g)(1).  See J.A. 11-12.[1]  These firearms had been seized in June 2007 during a warranted search of Ross's residence.  After unsuccessfully challenging the seizures on Fourth Amendment grounds in the district court, Ross entered his conditional guilty plea to the indictment, pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure.[2]

The events leading to the search of Ross's residence provide the factual predicate for this appeal.[3]  Those events began at about 6:40 on the evening of June 12, 2007, when an injured man covered in blood — later identified as George Holmes — came to Deborah Breeden's home in a subdivision near Charles Town, West Virginia.[4]  Breeden called 911 and her medical

---

[1] Citations herein to "J.A __" refer to the Joint Appendix filed by the parties in this appeal.

[2] The appeal reservation aspect of the plea agreement provided in relevant part that

> [t]his is a conditional plea within the meaning of Rule 11(a)(2). The defendant, Robert Ross[,] reserves the right to appeal the adverse ruling [on] his Motion to suppress evidence . . . . The parties agree that the issue preserved for appeal is fully case dispositive.

J.A. 170.

[3] The facts spelled out herein were either found by the magistrate judge and district court or are not disputed.

[4] The injured man initially gave several false names — including Jonathan Ross and George Ross — to Breeden and the first responders.  During the events of June 12, 2007, it was
(Continued)

4

examiner neighbor, Candy Shirley, seeking assistance. In response, the 911 dispatcher sent an ambulance to Breeden's home and notified the West Virginia State Police.

Shirley promptly arrived at Breeden's home and began to treat Holmes's injuries, attempting to abate the blood loss from lacerations on his arm. Holmes appeared to be intoxicated and initially claimed that he had injured himself by falling in the woods. Although Breeden and Shirley both advised Holmes that he could not have sustained his wounds from a fall, he stood by his story.

Shortly after this exchange, at about 7:00 p.m., an ambulance and two paramedics arrived at Breeden's home. The paramedics began treating Holmes, who was in critical condition. Holmes then changed his story somewhat and advised the paramedics that he had injured himself walking down the road and falling into a mirror. The paramedics did not believe this explanation, but they were primarily concerned with keeping Holmes alive.

When State Troopers Martin and Underwood responded to the request for assistance, they found Holmes intoxicated and being

believed by the authorities that the injured man's name was most likely Jonathan Ross. It was ultimately determined, however, that his name is George Holmes.

5

treated by the paramedics. Holmes also told the troopers that he had injured himself walking down the road and falling into a mirror, which they found unbelievable. Trooper Martin spoke briefly to Shirley, who thought the lacerations on Holmes's arm were defensive wounds from a knife. As a result, Martin suspected that Holmes had been the victim of a malicious wounding. After Martin unsuccessfully urged Holmes to reveal the truth regarding his injuries, Holmes was taken to the hospital.

Once the ambulance had departed, Shirley told the troopers she believed that Holmes had a brother, defendant Ross, who lived in a house about a hundred yards away on Black Walnut Drive. The troopers promptly went to the Black Walnut Drive residence and encountered Ross as well as six to eight others. Those present at Ross's residence were intoxicated, uncooperative, and belligerent. When the troopers advised the group at Ross's residence of Holmes's dire condition and that he was being rushed to the hospital, Trooper Martin overheard some individuals in the group accusing others of being "involved," plus statements that "the people involved needed to leave the house." J.A. 155. Based on these events, Martin concluded that a serious crime had probably been committed against Holmes. Additionally, Ross admitted that the Black Walnut Drive house

was his but refused to consent to a search of it by the troopers.

While at the Ross residence, Troopers Martin and Underwood requested backup support and Troopers Heil and Chandler responded. The four troopers then decided that Heil and Chandler would leave to seek a search warrant for Ross's residence, and that Martin and Underwood would remain at the residence while the warrant was being sought. Returning to the State Police detachment in Charles Town, Heil prepared his affidavit for the warrant, relying primarily on information provided by Martin and Underwood.

Trooper Heil's search warrant affidavit first asserts that "Ukn [unknown] subjects . . . maliciously wounded [Holmes]," and then spells out the supporting facts for the warrant being sought. J.A. 118-23. After describing his own qualifications, Heil related the following in numbered paragraphs:

4. On Tuesday 6-12-07 at approximately 1810 hours [6:10 p.m.], Trooper[s] . . . Martin and . . . Underwood responded to an injured person complaint at [Breeden's home].[5] [They] arrived on the scene and observed the victim, [Holmes], suffering from severe lacerations to the body. [Holmes] was also reported to have been throwing up blood prior to the Troopers['] arrival.

_____

[5] Although the search warrant affidavit relates that the troopers responded to the injured person complaint at 6:10 p.m., the evidence was that Holmes did not come to Breeden's home until about 6:40 p.m.

7

5.    [Holmes] advised Trooper . . . [M]artin he had been at a gathering at 306 Black Walnut [Drive] when he was attacked.[6]    [Holmes] did not provide any additional information before being transported to Jefferson County Hospital.

6.    Trooper[s] . . . Martin and . . . Underwood arrived on the scene at 306 Black [W]alnut Drive and encountered several intoxicated subjects at the residence.    . . .    Martin heard one of the occupants . . . utter that [two other occupants] needed to leave the residence because they were involved but [the occupant] would not provide . . . Martin with any additional information.

7.    Trooper . . . Martin observed that the occupants in the residence, Robert Ross [and six other persons present] were belligerent toward him and Trooper Underwood and refused to provide any information about the criminal incident.    Mr. Ross stated he was the owner of the residence but refused to allow . . . [M]artin to search his residence . . . .

8.    Trooper[s] Chandler and . . . Heil arrived on the scene and were briefed by . . . Martin about what had occurred.    Trooper[s] Heil and . . . Chandler advised that they would obtain a search warrant to search for possible evidence related to the crime committed.

9.    Your Affiant's previously described training and experience and the above described information leads your Affiant to believe that evidence of the crime committed is possibly contained within the residence located at 306 Black Walnut Drive.

J.A. 122-23.

---

[6]  The correct address of Ross's residence was 342 Black Walnut Drive.    The incorrect "306" number had been relayed to Trooper Heil by the emergency personnel, but Heil had been to Ross's residence and knew its correct location.    Ross has never maintained that this inaccuracy is material in any way to his suppression effort.

On the basis of Trooper Heil's search warrant affidavit, a state court magistrate in Charles Town issued a search warrant early that evening, commanding the search of Ross's residence for "any evidence of the [aforementioned] crime including any weapon used." J.A. 120.[7] Heil and Chandler then returned to Ross's residence with the search warrant and executed it. While conducting the search, Heil was notified that Ross was a convicted felon, and the troopers thereafter seized, inter alia, the three firearms underlying Ross's conviction. The search was completed by about 10:30 p.m.[8]

B.

After being indicted, defendant Ross moved to suppress the firearms seized during the search of his residence, asserting that the seizure contravened the Fourth Amendment. He maintained that the search warrant affidavit included false statements; that the false statements had been included knowingly and intentionally, or with a reckless disregard for the truth; and that the false statements were necessary for a finding of probable cause. Ross specifically targeted the

_____

[7] The search warrant does not indicate the time it was issued.

[8] As it turned out, Holmes was apparently not the victim of a malicious wounding. He had instead injured himself while attempting to break into a neighbor's home to steal an ATV.

9

affidavit's Paragraph 5, alleging, inter alia, that contrary to that Paragraph, neither the police report nor the criminal complaint indicated that Holmes had advised Trooper Martin that Holmes had been attacked.

The magistrate judge concluded that an evidentiary hearing was warranted, pursuant to Franks v. Delaware, 438 U.S. 154 (1978), and conducted the Franks hearing on January 15, 2009, in conjunction with the pretrial motions hearing. The Supreme Court's Franks decision entitles an accused to an evidentiary hearing, subject to two conditions, on the veracity of statements contained in a search warrant affidavit: (1) the accused must make a substantial preliminary showing that the affidavit contains false statements that were made knowingly and intentionally, or with a reckless disregard for the truth, and (2) the affidavit, after being purged of such false statements, must be insufficient to establish probable cause. See 438 U.S. at 155-56. The magistrate judge later explained in his report and recommendation that Ross was entitled to a Franks hearing because "[t]he police report [prepared by Troopers Underwood and Martin,] and the search warrant affidavit [prepared by Trooper Heil,] varied [on] whether or not [Holmes] told the Troopers he

10

was attacked." United States v. Ross, No. 3:08-cr-00019, slip op. at 9 (N.D. W. Va. Jan. 22, 2009) (the "Report").[9]

At the Franks hearing, Trooper Martin acknowledged that Paragraph 5 of the affidavit was inaccurate in two respects. First, the initial sentence of Paragraph 5 inaccurately asserted that Holmes had told Martin that Holmes had been attacked.[10] On this point, Martin explained that Holmes had actually said that he had come from Ross's residence or that general area, and that he (Martin) had himself concluded that Holmes had been attacked, based on his experience and on Shirley's opinion that the lacerations were defensive wounds. Second, Martin admitted that the other sentence of Paragraph 5 was also inaccurate, in that Holmes had provided some limited "additional information" before being transported to the hospital.[11] That is, Holmes had given several false names and differing explanations for his wounds. Trooper Heil also testified at the Franks hearing, explaining that he had predicated his affidavit on information provided by Troopers Martin and Underwood during the on-the-scene briefing

---

[9] The Report is found at J.A. 137-50.

[10] The first sentence of Paragraph 5 states, "[Holmes] advised Trooper . . . [M]artin he had been at a gathering at 306 Black Walnut [Drive] when he was attacked." J.A. 122.

[11] The second sentence of Paragraph 5 states, "[Holmes] did not provide any additional information before being transported to Jefferson County Hospital." J.A. 122.

11

at Ross's residence and obtained in a subsequent telephone conversation between Heil and Martin.[12]

On January 22, 2009, after the Franks hearing, the magistrate judge issued his Report to the district court, recommending that the motion to suppress be denied. The Report found that

> [Holmes] did not tell [Troopers Martin and Underwood] he was attacked, and Trooper Heil simply erred in drafting the search warrant [affidavit]. Trooper Heil had hurriedly obtained the information second-hand from Troopers Martin and Underwood, which explains the inaccurate statements.

Report 9. Notably, the magistrate judge then made an assessment of the affidavit — with the inaccurate statements purged (the "purged affidavit") — and concluded in his Report that the purged affidavit was sufficient to establish probable cause for issuance of the search warrant. See id. ("[E]ven after excising the false statements from the affidavit, the Court finds that probable cause still exists [for] the search warrant.").[13]

---

[12] The two paramedics, as well as Breeden, also testified at the Franks hearing. The first paramedic explained that he did not speak to Holmes and that the other paramedic treated Holmes. The second paramedic testified that Holmes claimed to have injured himself by falling on a mirror while walking down the road. Breeden explained that Holmes claimed to have injured himself by falling in the woods. Neither the second paramedic nor Breeden believed Holmes's explanation, but neither heard Holmes say he was attacked.

[13] The Report explained that a Franks hearing was justified in this case by the apparent discrepancies with respect to (Continued)

By its order of March 16, 2009, the district court adopted the Report, thus denying Ross's motion to suppress. See United States v. Ross, No. 3:08-cr-00019 (N.D. W. Va. Mar. 16, 2009) (the "Order").[14] The court, responding to Ross's objection that the magistrate judge committed clear error in finding that Trooper Heil "simply erred in drafting the search warrant [affidavit]," Report 9, concluded that "this Court simply cannot agree that the information provided was done so intentionally or recklessly." Order 15. Rather, the court adopted the finding of the magistrate judge that Heil was merely negligent in providing "inaccurate" and "false" information. See Order 9; see also Report 9.[15] Thereafter, Ross entered his guilty plea and, on July 15, 2009, the court sentenced him under 18 U.S.C. § 924(e) to 180 months in prison. Ross has timely noted

---

whether Holmes had told the troopers that he had been attacked. The Report concluded, nonetheless, that the purged affidavit is sufficient to establish probable cause for issuance of the search warrant. This conclusion suggests that defendant Ross was not entitled to a Franks hearing in the first place. See United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990) (observing that, to be material under Franks, omitted information must be "necessary to the finding of probable cause" (internal quotation marks omitted)).

[14] The Order is found at J.A. 151-66.

[15] The terms "inaccurate" and "false" are used somewhat interchangeably in the magistrate judge's Report and the district court's Order.

this appeal from the court's final judgment, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We assess de novo the legal determinations underlying a district court's suppression ruling, and we review the factual findings underlying such a ruling for clear error. See United States v. Rusher, 966 F.2d 868, 873 (4th Cir. 1992). A determination of probable cause is an issue of law to be reviewed de novo. See United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996). In making a probable cause assessment, a judicial officer must simply make "a practical, commonsense decision whether given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

## III.

### A.

Generally, an accused is not entitled to challenge the veracity of a facially valid search warrant affidavit. In its decision in Franks v. Delaware, however, the Supreme Court carved out a narrow exception to this rule:

14

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. 154, 155-56 (1978). After making the essential preliminary showing, an accused is entitled to an evidentiary hearing (commonly referred to as a "Franks hearing") on the veracity of the statements in the affidavit. The purpose of a Franks hearing is to determine whether the probable cause determination was based on intentionally false statements. See United States v. Akinkoye, 185 F.3d 192, 199 (4th Cir. 1999). If, after a Franks hearing, the defendant has shown by a preponderance of the evidence that false statements were knowingly and intentionally (or with reckless disregard for the truth) included in the search warrant affidavit, and that such false statements were necessary to establish probable cause, the evidence seized must be suppressed. See Franks, 438 U.S. at 155-56.

In order for the Franks rule to apply and justify suppression, the accused must satisfy both segments of the rule. First, the defendant must show by a preponderance of the evidence that the affiant placed false statements in the affidavit, either knowingly and intentionally or with a reckless

15

disregard for the truth.  See Franks, 438 U.S. at 156.  And it is clear that false statements placed in an affidavit on the basis of negligent police communications are insufficient.  See Herring v. United States, 129 S. Ct. 695, 703 (2009).  Second, with such false statements purged from the affidavit, it must yet be insufficient to establish probable cause.  See Franks, 438 U.S. at 155-56.  Thus, if an affidavit includes false statements knowingly and intentionally (or recklessly) made, the evidence seized in the resulting search will not be suppressed if the affidavit, purged of the false statements, is nonetheless sufficient to establish probable cause.  See United States v. Friedemann, 210 F.3d 227, 229 (4th Cir. 2000) (requiring suppression only if false statements necessary to finding of probable cause); Wilkes v. Young, 28 F.3d 1362, 1365 (4th Cir. 1994) ("[A] false or misleading statement in a warrant affidavit does not constitute a Fourth Amendment violation unless the statement is necessary to the finding of probable cause." (internal quotation marks omitted)).

On the merits of the suppression ruling, the district court determined, based on the Report and the record, that false and inaccurate statements had been included in the search warrant affidavit.  The court also found, however, that no false and inaccurate statements had been knowingly and intentionally (or

16

with reckless disregard for the truth) placed in the affidavit. The Order specified that

> Trooper Heil simply erred in drafting the search warrant [affidavit]. Trooper Heil had hurriedly obtained the information second hand from Troopers Martin and Underwood, which explains the inaccurate statements.

Order 9. Leaving no question about its ruling, the Order further specified that "this Court simply cannot agree that the information provided was done so intentionally or recklessly." Id. at 15. Although the court could well have ended its analysis (and declined to suppress) on the bases of those findings and conclusions, it did not do so. The court went further and analyzed the second segment of the Franks test and also concluded that the purged affidavit was sufficient to establish probable cause. See id. at 14.

B.

In his appeal, Ross first contends that the district court clearly erred in finding that Trooper Heil had not intentionally or recklessly included false statements in the affidavit. Secondly, Ross asserts that the court erred in concluding that the purged affidavit was sufficient to establish probable cause. To dispose of this appeal, we are entitled under Franks to proceed directly to Ross's second point and assess whether, with the false and inaccurate statements redacted, the purged affidavit is nonetheless sufficient to establish probable cause.

17

If the answer to that question is in the affirmative, Ross's suppression contention must be rejected.

As explained heretofore, the magistrate judge and the district court agreed that the search warrant affidavit was false and inaccurate in two respects, both of which related to Paragraph 5. First, contrary to Paragraph 5, Holmes did not advise Trooper Martin that he was attacked. Second, also contrary to Paragraph 5, the statement that Holmes had provided no other information before being taken to the hospital was inaccurate, in that Holmes had actually given several false names and two different explanations for his injuries. The only question for us to resolve is whether the purged affidavit — untainted by false or inaccurate statements — is nonetheless sufficient to establish probable cause for the search warrant.

As we have recognized, the concept of probable cause is not subject to a precise definition. See United States v. Richardson, 607 F.3d 357, 369 (4th Cir. 2010). Nevertheless, as the Supreme Court has explained, probable cause plainly "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). And, as in this very case, a search warrant affidavit is "'normally drafted by [a nonlawyer] in the midst of and haste of a criminal

18

investigation.'" United States v Colkley, 899 F.2d 279, 300 (4th Cir. 1990) (quoting United States v. Ventresca, 380 U.S. 102, 108 (1965)). The Supreme Court has also explained that elaborate specificity in such an affidavit is not necessary. See Illinois v. Gates, 462 U.S. 213, 235 (1983). As a result, an assessment of the presence of probable cause must be based on the totality of the relevant circumstances, rather than on the technical or rigid demands of a formulaic legal test. See id. at 230-31; United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990). In making a probable cause assessment, a judicial officer must simply have made "a practical, commonsense decision whether given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. Additionally, we have expressed a strong preference, when the circumstances permit, for law enforcement officers to seek and obtain a search warrant before conducting a search. See United States v. Srivastava, 540 F.3d 277, 288 (4th Cir. 2008).

Applying the foregoing principles to these circumstances, it is clear that the purged affidavit is sufficient to establish a "fair probability" that evidence of a malicious wounding would be found in Ross's residence. First, the nature and seriousness of Holmes's injuries, without reasonable explanation, are sufficient to confirm Trooper Martin's initial view that Holmes

19

had been the victim of a malicious wounding. Troopers Martin and Underwood had proceeded immediately from the location where the critically injured Holmes had been found and treated to Ross's nearby residence on Black Walnut Drive. Furthermore, the occupants of the Ross residence made several statements that those "involved" needed to leave. These statements, viewed in context, are sufficient to show that evidence of a malicious wounding would probably be found in Ross's residence on Black Walnut Drive. Applying principles of practicality and commonsense, the purged affidavit thus establishes probable cause for issuance of a search warrant for Ross's residence, seeking evidence of a malicious wounding. The firearms underlying Ross's conviction were therefore seized in accordance with applicable constitutional principles, and the district court did not err in declining to suppress them.

IV.

Pursuant to the foregoing, we reject Ross's contention on the seizure of the firearm evidence and affirm his conviction.

AFFIRMED

20