**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 09-4601

CHRISTOPHER JUDE BLAUVELT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:08-cr-00269-WDQ-1)

Argued: December 10, 2010

Decided: March 9, 2011

Before Sandra Day O'CONNOR, Associate Justice
(Retired), Supreme Court of the United States, sitting by
designation, TRAXLER, Chief Judge, and KEENAN,
Circuit Judge.

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Justice O'Connor and Judge Keenan joined.

## COUNSEL

**ARGUED:** Jason E. Silverstein, ROLAND WALKER &
MARK ZAYON, PA, Baltimore, Maryland, for Appellant.

Benjamin M. Block, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lisa J. Sansone, LAW OFFICE OF LISA J. SANSONE, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

## OPINION

TRAXLER, Chief Judge:

Christopher Jude Blauvelt appeals from his conviction and sentence for production of child pornography, *see* 18 U.S.C. § 2251(a) and (e); possession of child pornography, *see* 18 U.S.C. § 2252(a)(4)(B) and (b)(2); possession of cocaine, *see* 21 U.S.C. § 844(a); and two counts of distributing a controlled substance to a minor, *see* 21 U.S.C. §§ 841(a)(1) and 859(a). Having considered his numerous challenges, we affirm.

### I.

On January 11, 2007, Erin Ruley received a call from Anne Bridges. Bridges claimed that Appellant Christopher Blauvelt, Ruley's ex-boyfriend and the father of Ruley's child, had emailed Bridges explicit photos of Ruley's 14-year-old sister B.R. By the time she contacted Ruley, Bridges had already deleted the photos from her computer. Bridges, however, had also dated Blauvelt, and she knew the password to his email account. Bridges gave Ruley the password, and Ruley used it to access Blauvelt's email account. Ruley found pictures in the account, including images of B.R. "in pornographic poses," J.A. 598, wearing a "bra and thong underwear," J.A. 336, and apparently snorting cocaine with a minor male, T.J. Additionally, there was a close-up image of a young female's genital area. Ruley recognized the interior of Blauvelt's home in the background of the photos.

Ruley went to her mother Linda's home where again she accessed Blauvelt's email account and printed the pictures and a screen shot of Blauvelt's email inbox showing that the images were sent from Blauvelt's cell phone to his email account. After viewing the pictures, Linda reported the incident to the Baltimore County Police Department. Around 2:00 p.m. on January 11, Officer Minton arrived at Linda's home and interviewed Ruley, B.R., and Linda in person. Officer Minton viewed the images printed by Ruley and confirmed with B.R. that she was indeed the girl shown in the pictures. Ruley also showed Officer Minton Blauvelt's email account inbox on Linda's computer screen and indicated that she had printed the images sent to the inbox from Blauvelt's cell phone. Officer Minton did not independently verify Ruley's claim that the Hotmail account and the cell phone number belonged to Blauvelt.

Officer Minton then took Ruley, B.R., and Linda to the police station for an interview with Detective Ruffino of the Vice Unit and Detective Williams of the Narcotics Unit. T.J., the other minor pictured with B.R. in some of the photos, was also present for an interview. B.R. again identified herself as the girl in the photos, but she denied having any memory of the pictures being taken. T.J. claimed that he had taken the pictures of B.R. with Blauvelt's cell phone and then had returned the phone to Blauvelt. The Detectives concluded that T.J. could not have taken all of the pictures, however, because both B.R. and T.J. are visible in at least one photo. B.R. and T.J. explained that Blauvelt had supplied them with cocaine, alcohol and psilocybin mushrooms. And, as she had done for Officer Minton, Ruley again confirmed that the email address and cell phone number belonged to Blauvelt.

Officer Minton and Detectives Ruffino and Williams began preparing an application for a search warrant for Blauvelt's house based on these two interviews, the pictures printed by Ruley, and the Hotmail inbox viewed by Officer Minton. Around 9:00 p.m., as the officers were still drafting the war-

rant application, Officers Cohen and Hench were dispatched to observe Blauvelt's home, having been informed that the homeowner was suspected of committing child pornography offenses using his cell phone. The officers saw Blauvelt leave the house at approximately 10:00 p.m. and walk toward his vehicle. The officers stopped him, told him that he was not free to leave, that he was the subject of a criminal investigation, and that the police were in the process of applying for a search warrant for his house. Officers Cohen and Hench did not place Blauvelt in handcuffs, and did not at that time read Blauvelt his *Miranda* rights. Blauvelt was then offered the choice of remaining outside until the warrant was signed or returning inside accompanied by the officers. Officer Hench testified that law enforcement took these steps as a means of maintaining the status quo until a search warrant was issued:

> In these types of crimes where child pornography is supposedly taken and possessed, it was through electronic means, and the investigation said that a cell phone was possibly used, and this type of media can be destroyed rather easily. A cell phone could be destroyed, and the media on a cell phone or on the computer can be destroyed, and I was looking to pre-serve that evidence, along with the drug evidence. Drug evidence can also be destroyed, disposed of.

J.A. 299.

Blauvelt chose to wait inside with the officers, who per-formed a protective sweep of the house as they entered and then "sat . . . in the living room and waited for the search war-rant." J.A. 298. As they waited in Blauvelt's living room, additional officers arrived; Officer Hench estimated that at one point as many as eight officers were present. Blauvelt was allowed to use his cell phone; however, he was required to place it on a table after use and the officers "watched what he was doing with the phone." J.A. 318. Eventually, the warrant

was signed at 12:40 a.m., about two and one-half hours after Blauvelt returned inside with the officers to wait.

The five-page Probable Cause section of the application provided in relevant part:

On 01/11/07 . . . [Officer Minton] was dispatched to [the home of Ruley's mother] in reference to a sex offense report. Upon arrival . . . [Minton] was met by [Erin Ruley]. She advised that she had just obtained nude and sexually explicit photographs of her sister, [B.R.], . . . a minor at the time . . . the photographs were taken. [Ruley] then handed over five photographs of [B.R.] that were printed from a computer. [Ruley] advised that these photographs were emailed to an acquaintance from a Hotmail email address of MRJUDEBLACK@hotmail.com. [Ruley] advised that this Hotmail email address belongs to Mr. Christopher Jude Blauvelt . . . . [Ruley] has a child in common with [Blauvelt], and is in regular contact with him. [During] the interview [Ruley] showed . . . Minton a Hotmail email web page showing approximately five incoming emails to MRJUDEBLACK@hotmail.com from 4103820438 @vzwpix.com. She further advised that 4103820438 is the cell phone number for . . . Blauvelt's cell phone and Verizon wireless is his cell phone service provider. . . . [Ruley] advised that after receiving and viewing the photographs, she confirmed that her sister, B.R., was the subject in the pictures. . . .

. . . [Minton] then interviewed B.R. She identified herself as the female in the above photographs and advised that they were taken while at her friend Christopher [Blauvelt]'s house.

. . . Detective S. Ruffino . . . and . . . Detective T. Williams . . . responded to Northpoint precinct and

interviewed [B.R.]. She advised that . . . herself and a boy named [T.J.] . . . had been picked up by [Blauvelt], and driven to his house . . . [where] [h]e provided them with mixed alcoholic beverages . . . [and] "shrooms" . . . She advised that [Blauvelt] had a large amount of cocaine . . . and show[ed] her and T.J. how to snort the cocaine. . . . [B.R.] advised that after snorting the cocaine, she doesn't remember anything else until she awakened at her own home . . . .

J.A. 112-14.

The affidavit also described the detectives' interview of T.J. T.J.'s recollection of their drug use was very similar to that of B.R. T.J., however, also provided details about the explicit photos:

. . . [B.R.] then walked into the living room, according to [T.J.], and told [T.J.] to come into the bedroom. [T.J.] said he then got up from the couch and went into [the bedroom] where [B.R.] was laying on the bed still only wearing her bra and thong underwear. [T.J.] said he asked Christopher Blauvelt for his cell phone, telling [him] that he was going to take pictures of [B.R.]. Christopher Blauvelt gave [T.J.] his camera cell phone, and [T.J.] . . . took approximately 2-3 pictures of [B.R.] [as she performed a] sexual act. . . . [T.J.] said that he put the camera cell phone belonging to Christopher Blauvelt back on the sofa, leaving the pictures that he had taken on the cell phone. . . .

J.A. 114-15.

After being informed that the warrant had been signed, the officers read the warrant to Blauvelt and informed him of his *Miranda* rights, and Blauvelt signed a written waiver form.

Law enforcement officers then conducted the search and seized numerous items, including Blauvelt's cell phone, a desktop computer, a media storage card, a digital camera, and a mirror and a straw.

When Detectives Ruffino and Williams and Officer Minton arrived, they took Blauvelt into a bedroom, closed the door and conducted an interview after re-affirming that Blauvelt understood the explanation of his *Miranda* rights. Blauvelt initially denied taking any pictures of B.R. himself and indicated that T.J. had taken all of the pictures. When the detectives, however, pointed out that T.J. was in some of the pictures and could not have taken them himself, Blauvelt responded, "'Oops.'" J.A. 693. Blauvelt also admitted e-mailing himself the photographs of B.R. taken with his cell phone.

Forensic analysis of the items seized during the search revealed 23 video files containing child pornography on the desktop hard drive, 51 sexually explicit images of B.R., and four sexually explicit videos of B.R. on the media storage card. Additionally, forensic testing revealed trace amounts of cocaine on the mirror and straw seized from Blauvelt's residence.

Blauvelt was charged in a seven-count indictment as follows: (Count 1) Production of child pornography in violation of 18 U.S.C. § 2251(a) and (e); (Count 2) Possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2); (Count 3) Distribution of a controlled substance (cocaine) to B.R., a minor, in violation of 21 U.S.C. §§ 841(a)(1) and 859(a); (Count 4) Distribution of a controlled substance (psilocybin) to B.R., a minor, in violation of 21 U.S.C. §§ 841(a)(1) and 859(a); (Count 5) Distribution of a controlled substance (cocaine) to T.J., a minor, in violation of 21 U.S.C. §§ 841(a)(1) and 859(a); (Count 6) Distribution of a controlled substance (psilocybin) to T.J., a minor, in vio-

lation of 21 U.S.C. §§ 841(a)(1) and 859(a); and (Count 7) Possession of cocaine in violation of 21 U.S.C. § 844(a).

The jury returned a guilty verdict on all Counts except Counts 4 and 6 (alleging the distribution of psilocybin to B.R. and T.J.). Blauvelt received a 293-month sentence.

## II.

### A.

Blauvelt argues that the district court erroneously denied his motion to suppress the evidence seized pursuant to the search warrant for lack of probable cause. When considering a district court's denial of a motion to suppress, this court reviews findings of fact for clear error and legal conclusions de novo. *See United States v. Blake*, 571 F.3d 331, 338 (4th Cir. 2009). Even though we review de novo the district court's denial of a suppression motion, "the determination of probable cause by the issuing magistrate is entitled to great deference from this court." *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004). Essentially, this court's duty is limited "'to ensur[ing] that the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).

"Although the concept of probable cause defies a precise definition, it 'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found' in the place to be searched." *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The issuing judge is tasked with "mak[ing] a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

Blauvelt contends that the affiants failed to present the issuing magistrate with sufficient evidence to establish the reliability of the information supplied by Ruley, particularly his cell phone number and email address. Because law enforcement officers did not independently verify that the cell phone and email accounts belonged to him, Blauvelt suggests that it was critical for the supporting affidavit to include information reflecting the credibility, veracity and reliability of Ruley, the primary source of evidence against him.

Relying on *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996), Blauvelt likens Ruley to an unknown tipster whose information must be substantially corroborated to establish probable cause. In *Wilhelm*, we held probable cause to be lacking for a search warrant premised solely on information supplied to police by an anonymous phone caller whom the attesting officer never met face-to-face. *See id.* at 120-21. There, the only information supplied by the caller that could be corroborated prior to the search were directions to the defendant's house, which was insufficient to cure a "bare bones" supporting affidavit:

> Upholding this warrant would ratify police use of an unknown, unproven informant-with little or no corroboration-to justify searching someone's home.
> . . .

> The minimal corroboration provided in this case simply was insufficient. The conclusion that an informant is reliable and mature based only on brief telephone conversations is dubious, and the affidavit does not disclose any basis for Proctor's conclusion that her tipster was a "concerned citizen." Moreover, the only corroboration Proctor provided was that the informant's directions to Wilhelm's home were correct. Almost anyone can give directions to a particular house without knowing anything of substance about what goes on inside that house, and anyone

who occasionally watches the evening news can
make generalizations about what marijuana looks
like and how it is packaged and sold.

*Id.*

Blauvelt's attempt to force his case into the *Wilhelm* fact
pattern is clearly unavailing. Most obviously, Ruley is not an
anonymous tipster—not only did three officers meet with her
(and B.R.) in person, but they did so twice. As we have previ-
ously explained,

[t]here is a substantial difference between an infor-
mant who deals with the authorities in person and an
anonymous phone caller. . . . [C]ourts have had no
difficulty distinguishing between cases involving
face-to-face encounters with informants and cases
involving anonymous tipsters. Unlike an anonymous
tipster, an informant who meets face-to-face with an
officer provides the officer with an opportunity to
assess his credibility and demeanor and also exposes
himself to accountability for making a false state-
ment.

*United States v. Perez*, 393 F.3d 457, 462 (4th Cir. 2004)
(citation and internal quotation marks omitted). Moreover,
unlike the tipster in *Wilhelm*, Ruley provided information
about Blauvelt's criminal activity that could not have been
given by "anyone who occasionally watches the evening
news." *Wilhelm*, 80 F.3d at 120. Also, the investigating offi-
cers corroborated Ruley's information by actually viewing
both the images and the inbox for Blauvelt's email account,
as well as confirming with B.R. that she was the girl appear-
ing in the images and speaking with T.J.

The ample evidence set forth in the supporting affidavit
submitted with the warrant application afforded the magistrate
a substantial basis upon which to conclude that probable

cause existed. As already mentioned, Detectives Ruffino and Williams, as well as Officer Minton, personally viewed suggestive photos of B.R. in Blauvelt's apartment. Likewise, the officers viewed pictures of B.R. and T.J. appearing to use cocaine in Blauvelt's apartment. Officer Minton viewed Blauvelt's email inbox and observed that the digital picture files had been sent from the same cell phone account which Ruley identified as Blauvelt's. And, although law enforcement agents did not independently verify Blauvelt's ownership of these accounts before applying for the search warrant, they indicated in the supporting affidavit that Ruley had a previous relationship and shared a child with Blauvelt. Additionally, the officers had T.J.'s corroborating statements that the pictures were taken with Blauvelt's phone in his house. This evidence was more than sufficient "'to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found' in the place to be searched." *Richardson*, 607 F.3d at 369 (quoting *Ornelas*, 517 at 696).

### B.

Next, Blauvelt argues that the district court erroneously denied his request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court instructed that

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id.* at 155-56. If the defendant is able to establish the

> allegation of perjury or reckless disregard . . . and, with the affidavit's false material set to one side, the

> affidavit's remaining content is insufficient to estab-lish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 156.

In this case, Blauvelt contends that the warrant affidavit omitted material facts rather than included false ones. He claims the affidavit should have disclosed, but did not disclose, that Ruley and Blauvelt were engaged in child support and custody litigation at or near the time of this incident; that Ruley had previously filed a complaint leading to Blauvelt's arrest for telephone misuse; and that Ruley herself had a criminal record, allegedly having been convicted for driving under the influence. This information, Blauvelt claims, would have caused a reasonable reviewing magistrate to question Ruley's credibility and motives.

"To satisfy the *Franks*' intentional or reckless falsity requirement for an *omission*, the defendant must show that facts were omitted with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008) (internal quotation marks omitted). "[T]he omission [must be] designed to mislead or [must be] made with reckless disregard of whether it would mislead." *Id.* Therefore, to succeed on his *Franks* claim, Blauvelt must

> make a substantial preliminary showing that [the officers] omitted material facts that when included would defeat a probable cause showing—i.e., the omission would have to be necessary to the finding of probable cause—and that the omission was designed to mislead or was made with reckless disregard of whether it would mislead.

*Id.* (citation and internal quotation marks omitted).

Even though none of the officers had actual knowledge of the impeaching evidence against Ruley, Blauvelt insists its omission was intentional, or at least reckless, because the information was available to the officers had they looked. Blauvelt contends that knowledge of the information is imputed to the officers applying for the warrant under the collective knowledge doctrine. *See United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996). We disagree. The collective knowledge doctrine applies when at least some, but not all, of an investigative team has actual knowledge of facts necessary to a finding of probable cause. *See id.* ("[A]lthough the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that Wells was a convicted felon, it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of the seizure.") The knowledge is imputed from one officer to another such that the officers collectively are assumed to have actual knowledge of the imputed fact. But Blauvelt's argument goes too far. We have not applied this doctrine to impute knowledge of facts to an officer seeking a warrant merely because such facts are accessible to the law enforcement community at large. Moreover, even if the warrant affidavit had included this impeaching information, there would still have been a sufficient basis, in light of the totality of the circumstances, for the issuing magistrate to make a finding of probable cause. Indeed, probable cause was not based solely on the word of Ruley. The actual pictures were produced during a face-to-face meeting with the victim and corroborating statements from more than one witness were obtained. Accordingly, we reject Blauvelt's *Franks* argument.

## C.

Blauvelt contends that his three-hour detention prior to the issuance of the search warrant constituted an illegal arrest and

that the district court should have suppressed the incriminating statements he made while still in detention during the search of his home. *See, e.g.*, *Kaupp v. Texas*, 538 U.S. 626, 627 (2003) (per curiam) (discussing "the Fourth Amendment rule that a confession obtained by exploitation of an illegal arrest may not be used against a criminal defendant" (internal quotation marks omitted)). The government responds that it was constitutionally permissible for officers to hold Blauvelt in custody for a reasonable time in order to prevent the destruction or removal of evidence while they applied for a search warrant.\* *Cf. Illinois v. McArthur*, 531 U.S. 326, 328-33 (2001) (permitting the seizure of a private residence for two hours until a search warrant could be obtained where police believed the suspect would destroy evidence unless restrained).

Assuming without deciding that it was unlawful for law enforcement officers to detain Blauvelt under these circumstances and that the district court should have suppressed Blauvelt's statements, we nevertheless conclude that such an error was harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) (concluding that harmless-error analysis applies to coerced or involuntary statements). The statements that Blauvelt sought to exclude arguably constituted an admission that he illegally possessed and produced the child pornography images of B.R. The minimal significance of Blauvelt's inculpatory statements becomes apparent when viewed in the context of the overwhelming evidence of his illegal activity, much of which was discovered through a subsequent forensic examination of Blauvelt's computer. Through the testimony of Dana McAlister, a computer forensic examiner for the Bal-

---

\*Officer Hench testified that the crimes at issue were committed "through electronic means . . . and this type of media can be destroyed rather easily." J.A. 299. Officer Hench explained that "[a] cell phone could be destroyed, and the media on a cell phone or on the computer can be destroyed, and [he] was looking to preserve that evidence, along with the drug evidence. Drug evidence can also be destroyed, disposed of." *Id.*

timore County Police Department, the government identified 23 video files containing child pornography that were stored on Blauvelt's computer hard drive in a folder created in association with Limewire, a peer-to-peer file sharing program. "[P]eer-to-peer networks . . . [permit] users' computers [to] communicate directly with each other, not through central servers." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919-20 (2005). Based on her experience as a computer forensic investigator, McAlister explained that the use of peer-to-peer file sharing programs such as Limewire is a common and popular means by which child pornography is shared. *See generally* Jesse P. Basbaum, *Inequitable Sentencing for Possession of Child Pornography: A Failure to Distinguish Voyeurs from Pederasts*, 61 Hastings L. J. 1281, 1299 (May 2010) ("Though file-sharing technology is most commonly associated with the sharing of copyrightable material, recent studies show that peer-to-peer technology is increasingly popular for the dissemination of child pornography." (footnote and internal quotation marks omitted)).

Additionally, McAlister testified that 4 video files and 51 still images were recovered from a media storage card that was seized during the search of Blauvelt's home. The videos and stills showed a girl having sex with an adult male. During her testimony, B.R. confirmed that she was the girl in the videos and stills stored on the media card. Although the man's face was not visible, B.R. testified that the man in the videos and the stills was Blauvelt and that Blauvelt took the videos. B.R. identified the man's voice on the videos as being Blauvelt's, whom she has known since the age of five. Furthermore, the government presented the testimony of three adult women who had previously engaged in sexual activity with Blauvelt and were able to identify him at trial as the man in the videos and stills with B.R. based on his voice, his genitals (which bore no tattoo), and his mannerisms during intercourse.

In sum, there was overwhelming evidence that Blauvelt possessed and produced child pornography. Although the statements Blauvelt made on the night of the search arguably undercut his identity defense based on the tattoo, the other evidence establishing Blauvelt as the man in the videos and pictures with B.R. was so one-sided that it is clear to us beyond a reasonable doubt that the jury would have reached the same guilty verdict even without the statements. *See United States v. Forrest*, 429 F.3d 73, 81 (4th Cir. 2005) (explaining that the improper admission of evidence "is harmless, if viewing the record as a whole, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent the [improperly admitted evidence]" (internal quotation marks omitted)). In light of the record as a whole, we conclude that the statements Blauvelt sought to exclude had little effect compared to the compelling testimony from the victim herself and Blauvelt's former sexual partners that he was the man in the videos with B.R. and that he acquired the tattoo after the events in question.

Finally, to the extent the statements evidenced Blauvelt's guilt with regard to the possession and distribution of cocaine to a minor, the evidence of Blauvelt's guilt on these charges was wholly one-sided. The government introduced physical evidence recovered in the search of Blauvelt's apartment, including a mirror coated with cocaine residue and a straw. The mirror was recovered from Blauvelt's bedroom, where the cell phone pictures of B.R. were taken. Moreover, Detective Ruffino testified that the mirror was the same one appearing in the cell phone pictures of B.R. snorting cocaine. In addition, T.J. and B.R. both indicated that Blauvelt gave them cocaine and alcohol among other things. Again, we have little difficulty in concluding beyond a reasonable doubt that the jury would have reached the same guilty verdict even without Blauvelt's statements.

D.

Prior to trial, the government moved pursuant to Federal Rule of Evidence 404(b) to introduce sexually explicit video-

tapes Blauvelt made of himself masturbating and engaging in sexual relations with A.B., an adult female; and engaging in sexual relations with C.M., another adult female. The government also sought to introduce evidence that Blauvelt used illegal drugs with A.B. The district court denied the motion as to the videotape of C.M. but admitted the other evidence.

Blauvelt challenges this ruling, contending that the proffered material failed to qualify for one of the permissible uses specified by Rule 404(b), and that whatever probative value the evidence has is outweighed by the prejudicial effect of its admission into evidence. We review such evidentiary rulings for abuse of discretion. *See United States v. Basham*, 561 F.3d 302, 325 (4th Cir. 2009). Because "[j]udgments of evidentiary relevance and prejudice are fundamentally a matter of trial management," we "defer[ ] to the discretion of trial courts" and "will not vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally in admitting evidence." *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008) (internal quotation marks omitted).

Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such "bad acts" evidence, however, may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001) (internal quotation marks omitted). To be admissible under Rule 404(b), prior bad acts evidence: (i) must be relevant to an issue other than character, such as identity or motive, *see United States v. Siegel*, 536 F.3d 306, 317-18 (4th Cir. 2008); (ii) must be necessary to prove an element of the crime charged, *see id.* at 319; (iii) must be reliable, *see id.*; and (iv) its probative value must not be *substantially* outweighed by its prejudicial nature,

*see id.*; *United States v. Mohr*, 318 F.3d 613, 619-20 (4th Cir. 2003).

The district court did not specify the particular basis under Rule 404(b) on which it was admitting the "bad acts" evidence. Nonetheless, we may sustain the admission of such evidence on any viable theory. *See United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995).

The government contends the videotapes and stills were relevant to prove identity, motive and intent. We agree. First, Blauvelt raised identity as a defense, arguing that because he has a tattoo on his penis, he could not have been the adult male shown in the child pornography videos, who had no such tattoo. In support of this defense, Blauvelt offered the testimony of his friend Gregory Henderson that Henderson saw the tattoo in 2006. The government countered that Blauvelt acquired the tattoo after the creation of the videos and pictures that were the basis of the charges against Blauvelt. To this end, the government offered the videotape in which Blauvelt, without a tattoo, is seen masturbating, and offered evidence that the videotape was created after the charged child pornography videos and pictures were created.

Finally, the probative value of the evidence was not substantially outweighed by unfair prejudice. The 404(b) evidence was less sensational than the child pornography with which Blauvelt was charged.

### E.

Blauvelt next argues that the district court erred in applying an obstruction of justice enhancement to his offense level under the Sentencing Guidelines ("U.S.S.G."). Under U.S.S.G. § 3C1.1, a defendant's base offense level is to be increased two levels for obstruction of justice if:

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration

of justice with respect to the investigation, prosecu-
tion, or sentencing of the instant offense of convic-
tion, and (B) the obstructive conduct related to (i) the
defendant's offense of conviction and any relevant
conduct; or (ii) a closely related offense . . . .

The district court makes an enhancement determination
based on a preponderance of the evidence standard. *See
United States v. Grubbs*, 585 F.3d 793, 799 (4th Cir. 2009).

The government sought the two-level obstruction enhance-
ment on the theory that Blauvelt acquired the tattoo after
becoming aware of the charges for the purpose of mounting
an identity defense. Furthermore, the government contended
that an obstruction enhancement was appropriate because
Blauvelt bolstered this identity defense by calling Henderson,
who had terminal cancer, to testify that Blauvelt acquired the
tattoo in 2006 before the child pornography videos and stills
at issue were created.

The district court imposed the obstruction enhancement
based on two factual determinations. First, the district court
concluded that Blauvelt acquired his tattoo after the videos
were created. Second, in light of this conclusion and the other
evidence establishing Blauvelt's identity in the pictures and
videos, the court concluded that Blauvelt had encouraged
Henderson to testify falsely, describing it as a "cynical use of
a dying friend in an effort to obstruct justice." J.A. 1492.

Blauvelt's primary contention is that the obstruction
enhancement violated his Sixth Amendment rights as delin-
eated in *Booker* and *Apprendi* because the facts supporting the
imposition of the enhancement were neither admitted by him
nor found by a jury beyond a reasonable doubt. This argument
is clearly without merit; we have rejected this argument and
others like it on more than one occasion. *See Grubbs*, 585
F.3d at 799 ("[T]he court's underlying ability to make factual
findings regarding uncharged conduct does not violate the

Sixth Amendment's jury trial guarantee."); *Benkahla*, 530 F.3d at 312 ("Sentencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as that Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict."). Blauvelt does not contend that the district court treated the advisory guidelines sentencing range as mandatory or that his sentence exceeded the maximum authorized by the jury's verdict. Accordingly, we reject this argument.

To the extent that Blauvelt challenges the evidentiary basis for the district court's factual determination that he willfully obstructed justice, we disagree. The evidence previously recounted is sufficient to permit the district court to infer that Blauvelt called his friend as a witness to mislead the jury as to when Blauvelt acquired the tattoo. We conclude that the district court's findings in this regard were not clearly erroneous and supported the application of the obstruction of justice enhancement.

F.

During the trial, one of the jurors exchanged emails about an unrelated subject with Michael Leotta, an Assistant United States Attorney in the Northern Division of the Maryland United States Attorney's Office which was prosecuting the charges against Blauvelt. Leotta, however, did not personally participate in Blauvelt's prosecution and trial. At the time of the trial, Leotta was serving as treasurer of the Francis D. Murnaghan, Jr. Appellate Advocacy Fellowship, Inc., a non-profit legal services organization established by former clerks, colleagues and friends as a tribute to the late Fourth Circuit Judge Francis D. Murnaghan, Jr.

Leotta sent an email to the local accountant who had prepared the tax returns for the Murnaghan Fellowship requesting a bill for services rendered. As it turned out, this

accountant ("Juror #1") had been selected and was serving as a member of the Blauvelt jury. Juror #1 responded that supplying the accounting bill would be "[n]o problem," then added: "On jury duty this week up in Baltimore. Federal case — child porn etc. . . loving life (sarcasm). You guys do not get near enough the credit you deserve for what you do! I had no idea what it takes to do your job. I'm sure you don't get paid enough either." J.A. 1383AB. By the time this incident was brought to the attention of the district court, the jury had already rendered a verdict.

Blauvelt moved for a new trial, arguing that Juror #1's failure to disclose his relationship with the United States Attorney's Office and his improper contact with a federal prosecutor during the trial deprived Blauvelt of his right to a fair and impartial jury. The district court conducted an evidentiary hearing on the motion for a new trial. Leotta testified that he was not aware of Juror #1's jury service when he sent the email regarding the accounting bill. Upon receiving the reply email, Leotta indicated that he immediately sought the advice of the office's Professional Responsibility Officer. Juror #1 also testified, confirming that he knew Leotta before the trial as the treasurer of the Murnaghan Fellowship. Juror #1 testified that he knew Leotta was an attorney, but that he did not know Leotta was a federal prosecutor and actually believed that Leotta worked for the state government. He explained that his email was meant as a compliment "to everybody in this courtroom" because "from the court reporter, to these guys, to the Judge, how he ran things from start to finish, [he] was blown away by what [the lawyers and court personnel] actually have to go through." J.A. 1398. Finally, Juror #1 confirmed that the email exchange did not affect his ability to consider the evidence impartially and that he had no undisclosed bias toward the prosecution or the defense. The district court denied the motion for a new trial following the hearing.

The Sixth Amendment guarantees the right to a "trial[ ] by an impartial jury." U.S. Const. amend. VI. "The right to trial

by an impartial jury 'guarantees . . . a fair trial by a panel of impartial, indifferent jurors.'" *Robinson v. Polk*, 438 F.3d 350, 359 (4th Cir. 2006) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). This right to impartial jurors is threatened by "private communications between an outside party and a juror." *Fullwood v. Lee*, 290 F.3d 663, 677 (4th Cir. 2002). In fact, "[b]ecause the potential for mischief is so great when a third party establishes private, extrajudicial contact with a juror, the Supreme Court adopted the rule that 'any private communication . . . with a juror during a trial about the matter pending before the jury is . . . presumptively prejudicial . . . .'" *Id.* at 678 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

Applying the Supreme Court's decision in *Remmer*, we established the following burden-shifting approach to considering claims of outside juror contact:

> The party who is attacking the verdict bears the initial burden of introducing competent evidence that the extrajudicial communications or contacts were more than innocuous interventions. If this minimal standard is satisfied, the [*Remmer*] presumption is triggered automatically. The burden then shifts to the prevailing party to prove that there exists no reasonable possibility that the jury's verdict was influenced by an improper communication.

*United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996) (citation and internal quotation marks omitted).

The district court concluded that the communication between Leotta and Juror #1 was not such that the *Remmer* presumption of prejudice applied. The court concluded that Leotta's email was unrelated to the trial and noted that Leotta did not know that he was emailing a juror during an ongoing criminal trial and did not attempt to influence the verdict. Blauvelt, however, argues that the communication was related

to trial, and therefore presumptively prejudicial, because Juror #1's response to Leotta mentioned that he was serving as a juror on a federal child pornography case in Baltimore.

In determining whether the *Remmer* presumption of prejudice applies, we consider these factors: "(1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." *Cheek*, 94 F.3d at 141. Clearly, there was direct, private contact with a sitting juror. However, no one suggests there was any tampering or any attempt by Leotta to exert any influence; indeed, Blauvelt concedes that Leotta's email was unrelated to the trial. Rather, Blauvelt argues that because Juror #1 mentioned his jury service in a federal child pornography case, the exchange became something other than an "innocuous intervention[ ]." *Id.* (internal quotation marks omitted). We disagree. The *subject of the exchange* between Leotta and Juror #1 related to accounting services rendered to the Murnaghan Fellowship, not Blauvelt's trial. The fact that Juror #1 made reference to his jury service did not transform the nature of the exchange. Whether Juror #1's return email revealed any untoward bias is a separate issue analytically from the question addressed by a *Remmer* analysis—whether the defendant's right to an impartial jury was compromised by "an extraneous communication upon the deliberative process of the jury." *Stockton v. Commonwealth of Va.*, 852 F.2d 740, 744 (4th Cir. 1988). We conclude that the communication at issue here was inadvertent and innocuous and that Blauvelt has failed to present evidence that the communication was prejudicial.

Finally, Blauvelt challenges the district court's conclusion that Juror #1 was not actually biased. *See Fitzgerald v. Greene*, 150 F.3d 357, 364 (4th Cir. 1998) (discussing "a general Sixth Amendment claim of juror bias" as opposed to a juror bias claim that alleged dishonesty during voir dire). Blauvelt argues that Juror #1's bias is readily apparent from the text of his email. The district court, however, found after

observing Juror #1's testimony that the juror was simply expressing his "admiration for all the trial participants—including Blauvelt's counsel," that "he did not know that Leotta was a federal prosecutor," and that "he had no preconceived notions about the case before it started, or when he responded to Leotta's email." J.A. 1410o. Because this finding is reasonable given the evidence, we refuse to disturb it. Accordingly, we reject Blauvelt's argument that he was entitled to a new trial as a result of outside communications and juror bias.

### III.

For the foregoing reasons, Blauvelt's convictions and resulting sentence are affirmed.

*AFFIRMED*