**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-4398**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SETH LINKOUS THOMAS,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. James C. Turk, Senior District Judge. (7:10-cr-00016-jct-1)

Argued: March 21, 2012                    Decided: July 25, 2012

Before TRAXLER, Chief Judge, and KING and WYNN, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded by unpublished per curiam opinion.

**ARGUED:** Paul Graham Beers, GLENN, FELDMANN, DARBY & GOODLATTE, Roanoke, Virginia, for Appellant. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Timothy J. Heaphy, United States Attorney, Donald R. Wolthuis, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia; Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Seth Thomas appeals his convictions and sentence for multiple drug-related counts, raising several different issues. We affirm one conviction, reverse two others, vacate Thomas's sentence, and remand for resentencing.

I.

In 2006 and 2007, the Smokey Ridge Apartments in Christiansburg, Virginia, were a hotbed of illegal drug distribution. Thomas did not live there, but he worked close by and spent a lot of time there feeding his drug habit.

One of the main suppliers in the complex during that period was Aaron Thompson. Thompson sold painkillers and pills almost daily. He sold fentanyl patches less frequently, about once per month.[1] Thomas also sold painkillers and pills to various individuals in the apartment complex.

Thompson and Jennie Grissom were the primary drug suppliers to Jimmy Clark, Clark's girlfriend Whitney Branscom, and Clark's

_____

[1] Fentanyl is a very powerful pain-relieving drug, about 50 to 100 times stronger than morphine, often prescribed to cancer patients. Fentanyl comes in various forms, including gel patches that are placed on the skin so that the medicine can enter the bloodstream gradually over three days. Addicts, however, sometimes remove the gel from the patch and eat it, causing three days' worth of the powerful medicine to enter the body at once. The result can be respiratory depression, central nervous system depression, and death.

neighbor Kenneth Ponder.  Clark's relationship with Thomas, however, was more social.  Thomas would visit Clark almost daily, often sharing drugs with him.  Thomas also sold drugs to Clark a few times.

On the morning of November 28, 2007, Thomas asked Joseph Haley, a friend and co-worker, for a ride to the apartments the next morning because Thomas wanted to trade some percocet and methadone pills for fentanyl patches.  When Thomas arrived, he went to Ponder's apartment, which was a place where transactions were regularly made.  Thompson had acquired a batch of fentanyl patches and brought them to the apartment.  Thompson sold one patch to Ponder and multiple patches to Thomas.

Leaving Ponder's apartment together, Thomas and Thompson walked several doors down toward Clark, who was sitting outside his apartment. Thompson showed Clark 3-4 fentanyl patches, and Thomas also displayed at least one patch.  Clark, however, told the men that he did not have any money.  Thompson nevertheless decided to sell Clark a patch on credit because Thompson knew Clark's girlfriend had a job and could pay him later.

Clark mixed the contents of the patch with alcohol, injected the mixture intravenously through a syringe, and promptly went into respiratory distress.  Thomas called 9-1-1 and an ambulance came and transported Clark to the hospital, where he was treated for a fentanyl overdose.

4

Shortly after the ambulance arrived, Thomas called Haley to ask for another ride, this time from Ponder's apartment to the home of Barry Duncan. Thomas told Haley that Clark had overdosed, and when Haley picked up Thomas, Thomas started trying to hide his patches in Haley's car. Haley refused to take them, however. Haley dropped Thomas off at Duncan's house in the late afternoon that same day.

Duncan, his fiancée Traci McDougal, and Amber Dalton were at Duncan's residence when Thomas arrived. They had already heard about Clark's fentanyl overdose. Thomas showed them his remaining patches and told them he needed to get rid of them. Although Duncan had no money, Thomas sold him one for $30 on credit. McDougal then saw Thomas and Duncan enter the bathroom, and she heard Thomas tell Duncan to lift his shirt so Thomas could stick the patch on Duncan's back. According to McDougal, Thomas told Duncan he could cut the patch and eat the gel if the patch did not stick. McDougal, Dalton, and Thomas then drove to Dalton's house while Duncan went with his father to a Lowe's and later to his parents' house to have dinner.

When McDougal and Thomas arrived to pick up Duncan and bring him back to Dalton's house, Duncan was having difficulty walking and talking. Duncan revealed that he had eaten some of the gel because the patch would not stick. Then, back at Dalton's residence, Duncan could not stay awake. McDougal was

5

concerned and started to call 9-1-1, but Thomas grabbed her cell phone and told her there was no need to call—that Duncan would be fine. Eventually, McDougal put Duncan to bed. During the night, Duncan died of a fentanyl overdose. When McDougal discovered his condition the next morning, Dalton called 9-1-1. While EMS personnel attempted to revive Duncan, Thomas told Dalton not to say anything. Thomas also asked McDougal for the money Duncan owed him for the patch.

A federal grand jury for the Western District of Virginia subsequently returned an indictment charging Thomas with four counts: conspiring with Thompson (from an unknown time until November 29, 2007) to distribute fentanyl, resulting in death or serious bodily injury ("Count One"); distributing or aiding and abetting the distribution of fentanyl on November 28, 2007, which resulted in serious bodily injury ("Count Two"); distributing or aiding and abetting the distribution of fentanyl on November 28, 2007, resulting in death ("Count Three"); and distributing morphine on March 5, 2010 ("Count Four"). See 21 U.S.C.A. §§ 846, 841(a)(1), 841(b)(1)(C) (West 1999 & Supp. 2012); 18 U.S.C.A. § 2 (West 2000). Thomas pled guilty to Count 4 and proceeded to trial on the remaining counts.

At the close of the government's case in chief, Thomas moved unsuccessfully for judgment of acquittal with regard to each of the three counts. See Fed. R. Crim. P. 29. Thomas also

6

renewed his motion when the government put on rebuttal evidence. The jury eventually returned a verdict of guilty on each count.

In calculating his advisory sentencing range under the Guidelines, the district court grouped the three offenses, see U.S. Sentencing Guidelines Manual § 3D1.2(d) (2010), and employed a base offense level of 38. Over a defense objection, the court added a two-point enhancement for obstruction of justice. See U.S.S.G. § 3C1.1. With a total offense level of 40 and a criminal history category of III, Thomas's advisory guidelines range was 360 months to life. Ultimately, the court sentenced Thomas to 300 months, stating that it would have sentenced Thomas to 240 months but for the obstruction-of-justice enhancement.

## II.

Thomas first argues that the district court erred in denying his motion for a judgment of acquittal on Count One. We agree.

We review de novo the denial of a motion for judgment of acquittal. See United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1401-02 (4th Cir. 1993). When addressing a sufficiency-of-the-evidence challenge, "[w]e must view the evidence in the light most favorable to the government and inquire whether any rational trier of fact could find the

7

essential elements of the crime beyond a reasonable doubt." United States v. Wilson, 118 F.3d 228, 234 (4th Cir. 1997).

In order to prove a conspiracy to distribute narcotics, the government must establish that "(1) an agreement to possess with intent to distribute [narcotics] existed between two or more persons; (2) [the defendant] knew of the conspiracy; and (3) [the defendant] knowingly and voluntarily became part of the conspiracy." United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008). The government may prove a conspiracy by circumstantial evidence, including evidence of a "tacit or mutual understanding" between the defendant and his accomplice. United States v. Ellis, 121 F.3d 908, 922 (4th Cir. 1997) (internal quotation marks omitted). Evidence showing a buyer-seller relationship is not sufficient by itself to establish a drug-distribution conspiracy. See United States v. Mills, 995 F.2d 480, 485 (4th Cir. 1993). However, "evidence of any understanding reached as part of the buy-sell transaction that either party will engage in or assist in further distribution is sufficient to prove . . . a conspiracy." United States v. Edmonds, 2012 WL 1592978, at *5 (4th Cir. May 8, 2012). Additionally, we have held that evidence of a continuing buyer-seller relationship coupled with evidence of large quantities of drugs, or "continuing relationships and repeated transactions"

can create a reasonable inference of an agreement.  Reid, 523 F.3d at 317.

We agree with Thomas that the evidence in this case shows only a buyer-seller relationship between Thomas and Thompson. The government showed only that Thomas made one small purchase of fentanyl patches from Thompson.  It offered no evidence of an ongoing relationship between the two.  Besides the single purchase, the only evidence linking Thomas and Thompson concerned their proximity to one another during the one day when the sales at issue in this case were made:  After Thomas and Ponder obtained their patches from Thompson, both Thomas and Thompson walked straight toward Clark and offered to sell him fentanyl patches.

The government contends that the evidence that Thomas may have bartered with Thompson for fentanyl with Thomas's own pills as opposed to simply paying cash is evidence of a conspiratorial relationship.  However, we do not see how this fact is evidence of a conspiracy.  See United States v. Kincannon, 567 F.3d 893, 897 (7th Cir. 2009) ("An agreement to exchange drugs for money (or something else of value) – the crux of the buyer-seller transaction – is insufficient to prove a conspiracy." (emphasis added)).

The government also maintains that Thomas's attempts to find fentanyl buyers in Smokey Ridge and the fact that "Thomas

9

and Thompson jointly approached Clark and offered patches for sale" is evidence of a conspiracy. Appellee's brief at 14. However, there was no basis for a reasonable inference that Thomas's attempts to identify people interested in purchasing patches were for any purpose other than to sell the patches that Thomas, himself, had purchased. That Thomas and Thompson may have shopped their respective wares to Clark at the same time does not give rise to a reasonable inference that they had reached any agreement, tacit or otherwise. The district court therefore erred in denying Thomas's motion for a judgment of acquittal on the conspiracy count.

III.

Thomas next maintains that the district court erred in denying his motion for a judgment of acquittal on Count Two, in which the government sought to prove that Thomas aided and abetted Thompson's distribution of a fentanyl patch to Clark. We agree.

"To prove the crime of aiding and abetting the government must show that the defendant knowingly associated himself with and participated in the criminal venture." United States v. Winstead, 708 F.2d 925, 927 (4th Cir. 1983). Showing the defendant's mere presence at the scene of a crime is insufficient. See United States v. Spoone, 741 F.2d 680, 686

10

(4th Cir. 1984). Rather, the government must "show some affirmative participation which at least encourages the principal offender to commit the offense." United States v. Kelly, 552 F.3d 824, 831 (D.C. Cir. 2009) (internal quotation marks omitted).

The government maintains that Thomas assisted Thompson's distribution of fentanyl to Clark by purchasing fentanyl from Thompson, offering to sell to Branscom, and approaching Clark jointly with Thompson. As we have explained with regard to Count One, however, there is no basis in the record for a reasonable inference that Thomas's actions were for any purpose other than to facilitate his own sale of his own patches. Nor does it even appear that Thomas's actions regarding Clark assisted Thompson in any way in making the sale.

IV.

Thomas next maintains that the district court abused its discretion in refusing his requested aiding and abetting instruction on Count Three, which pertained to the sale of a fentanyl patch to Duncan. We disagree.

The defense theory at trial was that Duncan bought the patch that killed him from Thompson at Smokey Ridge rather than from Thomas at Duncan's house. This theory was based on testimony from Amber Dalton that Thomas and Duncan left the

11

house for 15 minutes before returning and going into the bathroom together to stick the patch on Duncan's back. Based on this theory, the defense argued that Thompson's distribution of the patch to Duncan would have completed the crime and that one cannot aid and abet an already-completed crime. Thus, Thomas requested that the court instruct the jury that "[a] person cannot be guilty of aiding or abetting a completed crime." J.A. 563. The district court did not include this specific language in its charge. However, the court instructed the jury:

> In order to be found guilty of aiding and abetting the . . . crimes charged in Counts Two and Three . . . , the government must prove beyond a reasonable doubt that the defendant:
>
> One, knew that the crimes charged were to be committed or were being committed;
>
> Two, knowingly did some act for the purpose of aiding the commission of that crime;
>
> And, three, acted with the intention of causing the crimes charged to be committed.

J.A. 472.

Because the court's instruction explained that in order to convict, the jury would need to find that Thomas "knew that the crimes charged were to be committed or were being committed," the charge did not permit the jury to find that Thomas aided and abetted after the completion of the crime. Thus, Thomas's request was effectively covered by the court's instructions.

12

V.

Thomas next contends that the district court abused its discretion by denying his motion to exclude evidence that he distributed drugs other than fentanyl and "ripped off" drug purchasers.

Thomas moved unsuccessfully under Federal Rule of Evidence 404(b) to exclude any evidence that he had distributed drugs other than fentanyl, such as morphine. However, the district court overruled Thomas's objections and allowed the admission of such evidence. For example, co-worker Haley testified that Thomas supplied him with pain pills in exchange for transportation from time to time, and Steven West, a neighbor who helped Clark after he overdosed on the fentanyl patch, testified that Thomas sold him pain drugs 10-15 times in the six months prior to the overdose. Thomas also moved unsuccessfully to exclude evidence that he was a dishonest drug dealer. West testified that he stopped buying drugs from Thomas because Thomas "ripped [him and others] off on several occasions." J.A. 118.

Even assuming arguendo that such evidence was erroneously admitted, its admission was harmless as to Count Three. See United States v. Forrest, 429 F.3d 73, 81 (4th Cir. 2005) (explaining that the improper admission of evidence "is harmless, if viewing the record as a whole, it is clear beyond a

13

reasonable doubt that the jury would have returned a verdict of guilty absent the [improperly admitted evidence]" (internal quotation marks omitted)). McDougal testified that she saw Thomas agree to give Duncan the fentanyl patch on credit; she then saw the two proceed into the bathroom; and she heard Thomas in the bathroom explaining to Duncan about the patch as he placed it on Duncan's back. Ponder also testified that Thomas admitted to him that Thomas gave the patch to Duncan.

Unlike McDougal, Dalton did not testify that she heard Thomas agree to sell Duncan a patch, and, during closing arguments, defense counsel made much of the fact that Dalton testified that Thomas and Duncan left the house for 15 minutes before returning and going into the bathroom together. Counsel urged the jury to credit Dalton's testimony and infer that in that 15 minutes, Thomas drove with Duncan to Smokey Ridge, less than a mile away, so that Duncan could purchase a patch from Thompson. This theory of course begged the question of why Thomas would not have simply sold Duncan one of the patches he had shown to McDougal, Dalton, and Duncan. The defense argued that those patches were for Thomas's own use and that he would not have wanted to part with them. That theory, however, was at odds with another part of Dalton's testimony in which she stated that Thomas had been nervous because of Clark's overdose and that he had displayed his patches and said that he "needed to

14

get rid of them."[2]   J.A. 222.   In the absence of any viable defense theory regarding Count Three, we conclude that Thomas was not prejudiced by any error in the admission of the complained-of evidence.

VI.

Thomas finally argues that the district court erroneously enhanced his sentencing guidelines offense level for attempted obstruction of justice.   In light of our holding that the district court erred in failing to grant Thomas's motion for a judgment of acquittal on Counts One and Two, we vacate Thomas's sentence and remand for resentencing.   Nevertheless, for the sake of judicial economy, we will address the obstruction-of-justice issue.

We review a district court's application of an obstruction-of-justice enhancement for clear error.   See United States v. Blauvelt, 638 F.3d 281, 293 (4th Cir. 2011).   We conclude that the district court did not clearly err in applying the enhancement.

Evidence presented at sentencing showed that Thomas was jailed prior to trial with an inmate named Sean Robertson;

---

[2] Indeed, Dalton testified that she assumed that Thomas and Duncan were making some sort of drug deal when they went into the bathroom together.

Robertson learned that his girlfriend Shameke Moore was on the jury panel as a potential juror in Thomas's case and revealed this information to Thomas; and Thomas then suggested that Robertson contact Moore and gave him suggestions to convince Moore to adopt Thomas's view of the case.

Robertson later called Moore, summarized the case against Thomas, and explained why Moore should vote not guilty. He even suggested that there might be some money in it for Moore. Moore told Robertson that she was "onboard" and would vote in Thomas's favor. J.A. 634. Thomas subsequently followed up with Robertson to see whether Moore would vote to acquit him. Robertson told him that Moore had said that she would.

During jury selection, Moore did not reveal to the court that she had discussed the case before or that she had a personal interest in it even when specifically asked whether she had read or talked to anyone about the case. Moore ended up not being selected to serve on Thomas's jury, however.

Under United States Sentencing Guidelines § 3C1.1, the court must enhance the defendant's offense level by two if it finds that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." Application Note 4(A) specifically states that "unlawfully influencing a . . . juror,

16

directly or indirectly, or attempting to do so" is conduct that qualifies for an obstruction enhancement. U.S.S.G. § 3C1.1 cmt. n.4(A).

Thomas argues that since any attempt by him to influence Moore was oral, rather than written, it was not unlawful because it was not prohibited by 18 U.S.C.A. § 1504 (West 2000). The government responds correctly, however, that regardless of whether it was unlawful under § 1504, it clearly was unlawful under 18 U.S.C.A. § 1503(a) (West 2000), which proscribes "corruptly . . . endeavor[ing] to influence . . . any . . . petit juror . . . in the discharge of his duty."

Thomas suggests that the district court clearly erred in finding that any attempt by him to influence Moore was corrupt. Certainly, however, the evidence supported the conclusion that Thomas attempted to use Robertson to persuade Moore to vote for Thomas's acquittal. That Thomas's plan included the fact that Moore would conceal Robertson's overtures is simple common sense. Without such concealment, after all, Moore clearly could never be seated on the jury. The district court was thus on firm ground in applying the enhancement.

## VII.

In sum, for the foregoing reasons, we reverse Thomas's convictions on Counts One and Two, affirm his conviction on Count Three, vacate his sentence, and remand for resentencing.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>